[Filed March 23, 1891.]

## NATHAN PEARCY *v.* WILLIAM BYBEE ET AL.

SUIT TO QUIET TITLE—RIPARIAN OWNERS—ACCRETION—CASE LEFT IN DOUBT BY THE EVIDENCE.—In a suit to quiet title to certain alluvion, claimed by the plaintiff and defendants, who were all riparian owners, when the question was left in doubt by the evidence, owing to its apparent conflict as to the questions of fact, and it was manifest that some or all of the parties were entitled to the land in controversy, as an accretion; *held,* that the court would divide the land in controversy between the respective claimants on equitable principles, and quiet the title of each riparian owner to the parcel allotted to him.

Multnomah county: L. B. STEARNS, Judge.

Plaintiff appeals.     Reversed.

This is a suit to quiet the title to a parcel of land situate in Multnomah county. The referee found against both claimants; that is, that neither of them was entitled to the land in controversy, which finding was confirmed by the court and a final decree entered dismissing the suit, from which both parties have appealed. The facts sufficiently appear in the opinion.

*R. Williams,* for Appellant.

In this state where persons derive title to their land from the United States under the laws for the sale and disposition of the public lands, as all parties do in this case, the grantee, where the land is bounded by a meandered navigable stream like the Columbia river, takes only to the stream. (*Bates* v. *Railroad Co.* 1 Black, 204; Gould, Waters, § 73; *Bristol* v. *Carrol County,* 95 Ill. 84; *Schurmeier* v. *Railroad Co.* 10 Minn. 82, 88 Am. Dec. 59.)

Affirmed by the supreme court of the United States. (7 Wall. 272; *Yates* v. *Milwaukee,* 10 Wall. 497.)

This rule was adopted as the law of this state in the case of *Minto* v. *Delaney,* reported in 7 Or. 337. (*Shaw* v. *Oswego I. Co.* 10 Or. 371, 45 Am. Rep. 146; *Parker* v. *W. C. P. Co.* 17 Or. 510.)

In the government survey the bank of the Columbia river was meandered, and so was the bank of the island. Whatever riparian rights attached to the shore owners on the river, attached equally to the shore owner on the island. (*Stolp* v. *Hoyt,* 44 Ill. 219; Gould on Waters, § 166.)

The rights of the parties are not altered by the change in

the channel caused by the erection of the government dyke. (*Buse* v. *Russell*, 86 Mo. 209; *Fillmore* v. *Jennings*, 78 Cal. 634.)

*F. A. E. Starr*, for Respondents.

The shore or riparian owner is possessed of important rights by virtue of the ownership of the shore; he is entitled to all accretions formed against the shore; to wharf privileges, and the right to pass to and from deep water; that these rights extend laterally, and not up and down the stream. (Gould on Waters, § 148; *Parker* v. *W. C. Packing Co.* 17 Or. 510; *Minto* v. *Delaney*, 7 Or. 337; *Moore* v. *W. T. & L. Co.* 7 Or. 355; *Yates* v. *Milwaukee*, 77 U. S. 497; *Railroad Co.* v. *Schurmeier*, 7 Wall. 272; *County of St. Clair* v. *Lovingston*, 23 Wall. 59; *Middleton* v. *Pritchard*, 3 Scam. 510, 38 Am. Dec. 112; *Inhabitants of Deerfield* v. *Arms*, 17 Pick. 41, 28 Am. Dec. 276; *Zug* v. *Com.* 70 Pa. St. 138; *Simons* v. *French*, 25 Conn. 352.)

STRAHAN, C. J.—The land in controversy is situated in the Columbia river three or four hundred yards from its south bank and near its confluence with the Willamette. An island called Pearcy's island lies in the Columbia river just below the land in dispute. This island was surveyed by the United States, and the plaintiff duly acquired the title of the United States thereto under the donation law. The land in controversy is situated at the upper end of Pearcy's island, and consists of a sandbar which has been slowly increasing in size for a great many years, until a considerable part of it is now covered with a growth of willow and cottonwood, and it yields grass. Pearcy's settlement was in 1851, and before the land was surveyed. Not far from the same time William Bybee and James Bybee each made a settlement on separate parcels of land lying on the south bank of the Columbia river and bordering thereon. These settlements were also under the donation law, and in due time their titles were perfected by final proof and the issuance of patents to the respective claimants. These claims are opposite to the land in controversy. The defendant Adams has succeeded to all the rights of James Bybee in the lands patented to him as a donation claim. William Bybee claims so much of this

sand bar as lies in front of his claim as an accretion thereto, and Adams sets up the same claim to all lying in front of the James Bybee claim, while the plaintiff Pearcy claims the entire bar as an accretion to his island claim. So far these conflicting claims all turn upon questions of fact which must be determined by the evidence. The plaintiff rests his claim on the fact that this alluvion formed at the head of his island and connected itself therewith and thereby became a part of said island. There is what is called a depression at the head of the island several feet below the surface of the accretion, on the bottom of which grass and some willows grow; and for a long time, unless the water was very low, there was water in this depression, and in the earlier years of the settlement of the country this depression formed a channel through which water craft often passed. It is being constantly filled up, however, by natural causes, so that it now produces some vegetation.

The claim of the defendants Wm. Bybee and Park Adams is about as follows: That at the time of the settlement of Wm. Bybee and James Bybee upon their donation land claims, the sand bar in dispute was formed in front of their respective land claims, and was connected with the shore at the upper and lower ends thereof; that it continued to form and rise above the water constantly thereafter until the water which was then between this bar and the shore had so far receded that at low water a person could pass dryshod from the shore to the sand bar. All the parties claim to have been in possession ever since the time of their respective settlements, using the same mainly for pasturage. Under these facts, the defendants claim the sand bar as alluvion attached to the shore and as an accretion to their lands respectively. On all of these questions the evidence is very conflicting; though this conflict may be more apparent than real. Time and tides have wrought many changes in the formation and location of the bars and channels about this island in the last twenty-five or thirty years. No doubt the witnesses narrated events as they now remem-

ber them, and the changes occurring by natural causes would account for many of the apparent discrepancies. However this may be, it seems hardly practicable to decide the disputed questions of fact so as to fully sustain the contention of any of the parties. If full credit be given to all of the plaintiff's witnesses, and assuming the facts are as his evidence tends to prove them to be, then his contention is made out and his right to the sand bar in question is established. On the other hand, assuming that the defendants' witnesses are to receive full credit and that the facts are as narrated by them, then the plaintiff's case is met and overthrown, and the defendants would be entitled to the premises in dispute or a considerable portion thereof.

We have no means of determining these disputed questions of fact otherwise than by attentively weighing and considering the testimony of the witnesses, and we have seen that amidst this conflict it is impossible to determine just where the truth lies. The plaintiff's assertion of title to this land commenced earlier than the defendant's, and he has exercised greater control over it, and amidst the conflict and doubt surrounding the case a somewhat stronger equity seems to be with him in the evidence. We have therefore concluded to quiet his title to one-half of the land in controversy, lying immediately above what is known as Pearcy's island and abutting thereon, and the other half thereof to the defendants.

A decree will therefore be entered here to that effect, and the cause will be remanded to the court below with directions to cause the lines to be marked and ascertained, and if the defendants desire it, the half decreed to them may also be partitioned and set apart by the court below, at the same time, to be held by the defendants respectively in severalty.

These conclusions lead to a reversal of the decree of the court below. Neither party will recover costs against the other, either in this court or the trial court.